Before us today, the first case is Banks v. United States, Mr. Christensen. Yes, Your Honor. And you're reserving three minutes of your time for rebuttal, is that correct? That is correct. Okay. All right, you may proceed. Thank you. May it please the Court, Counsel, my name is Mark Christensen. I'm here on behalf of the 37th plaintiff in this case. Mr. Christensen, in the blue brief, you asked us to exclude Dr. Nairn's testimony under a Dalbert standard. Did you raise those arguments before the district court at the time Dr. Nairn testified? We did. Where is that? I couldn't find it. We did it in two different ways. Initially, when Dr. Nairn testified in 2007 at the liability trial, we had filed a motion in Lemonade to exclude his testimony. Under Dalbert? Under Dalbert. Uh-huh. And at page 57 of 78 Federal Circuit, or excuse me, Lexis 318, at page 57 and 58, the Court addresses the Dalbert objection. Okay. And I directly have that as being an inadequate analysis under Dalbert. Okay. And we also objected, we filed a motion to bar nearshore composition evidence prior to the damages phase and to bar Dr. Nairn's testimony. Where is that? That, I don't have the specific transcript cited, but it is in our opening brief that we did that. I'll take a look. Are those materials in the joint appendix? They would be in the joint appendix. Do you have a joint appendix cite for us? Not directly. Okay. In other words, I don't have it off the top of my head. You can tell us that when I come back up. Yes. Let's see. Let me ask you this. Can a lakebed's classification as sandy or cohesive change from one part of the shore to another part of the shore? Because the 99 report classifies Lake Michigan as cohesive, period. But it seems that the experts' reports are sort of breaking into parcels. I think that it's broken into parcels depending on the availability of a sand cover over the underlying cohesive layer. What the 99 report establishes is that that protective sand layer was eroded over 100 years from the jetties, such that there was an inadequate layer of sand to protect the cohesive layer. Walk me through how you arrived at that 60% to 70% estimate of erosion being caused by the core. We walked through that in two ways. The first is that, and refer me somewhere, like in your briefs, because I don't have that. You don't have that? Okay. It's clear in your brief. In our brief, we do it in two ways. Dr. Scudder Maddy's testimony is cited in the brief where he establishes that, as a falluvial expert, that the bed load of the sand coming down the river is at least 60 to 65 cubic yards a year. And that with storm events, it might even be more. So if you look at the 99 report, the 99 report talks about 110 cubic yards of the littoral drift, gross, both north and south. But it doesn't include the sand from the river. And so once Scudder Maddy added the littoral drift to the bed load that was coming down the river and the sand that was blocked by the jetties, he said that if you took the 100% of erosion that was happening and you subtracted the 25% to 30% that people thought was actually eroding, he arrived at his 60% to 70% figure. Okay. Did the 99 report establish conclusively that the damage is irreversible and permanent? I think it did. In the 99 report, they... And that report was used as a basis for the finding of the accrual, when the appellants had notice of a permanent taking. Is that correct? That is correct. I'm sorry. Right before that time, when the case was appealed on the jurisdiction issue, had there already been findings of fact on the different alternative findings that the Court of Federal Claims had already made? No. This was appealed twice on the jurisdictional issue and twice it was mandated that the statute of limitations had not been... that the lawsuits had been timely filed within the statutory period. In the court's mandate, it found that the erosion was permanent from the 96 report. In the 99 report, they monitored a mitigation program from about 1970 to 1999. I'm interested in exploring whether that finding, that establishing of the accrual in jurisdiction, the finding that the damage was irreversible and permanent, to what extent does that apply over to the liability issue? We think it was a predicate factual finding. And that the court evaluated facts outside of the complaint, and that fact was actually at issue by virtue of the government's opposition to it, such that if certain facts on jurisdiction are challenged, if those facts then become necessary and predicate, as the court is aware of the case law, then, in fact, those are adjudicated facts that cannot be relitigated. And so that's our... we feel there's two roads to... That's true unless the issues are different in the two inquiries, in the liability inquiry and the jurisdictional inquiry. If the issues are different, but it seems to me that they may not be different. I think they're identical. That argument was made in the last iteration. It was, but it was not ruled upon. Rather, the mandate was once again reinstated, and the Court of Claims was encouraged to reevaluate its merits findings in light of it, and it did not. And what the Court of Claims did, the way I understand it, and I'm asking, I'd like both parties to address these questions, what the Court of Federal Claims did said, well, we're now being asked to go ahead and establish liability, and instead of having a whole new liability inquiry, I'm just going to use one of the alternative findings I've already made. Is that correct? That is correct. That is correct. And those alternative findings were made pursuant to the 99 report. Those alternative findings were made based upon Robert Nairn's incompetent and invalid and unscientific expert opinions. And they were made in despite language in the mandate which said, we're not telling you what to do, but. But. That is correct. What Dr. Nairn's report did was it took unverified, unscientific, propositional truth and used it to contradict certain truth. And certain truth is that if you have over 100 years of blockage of sand and you have an inadequate, by its own admission, an inadequate mitigation program only from 1970 to 1999, and your own report says that you have over 300,000 cubic yards in deficit in terms of mitigation, and you admit you're putting it in at the wrong time, in the wrong place, in the wrong size, that for certainty then, the evidence is uncontradicted that we've had down cutting, the cohesive layer has been exposed, the mitigation has never addressed the historical loss of sand before 1970, from 1970 to 1999. Let me throw in a question there. So that's certainty. No, no, let me throw in a question. You argue that you should receive compensation for the value of lost sand. And you have so much. That is an alternative damage argument. That is correct. Did you make that argument to the trial court? Yes, we did. Did you submit evidence on the value of the sand to the trial court? We did. We submitted evidence by a witness that had the value, I think, at 40 cents a cubic yard. Where is that in the record? You'll find it and give it to me? I will. Okay. Because that's another thing I couldn't find. Okay. That's a fair answer. If we were to reverse on the law of the case issue, what does that do to the damage that's fined? Does it upend it in its entirety or just part of it? Well, the only damage finding that we had was that one property was in a cohesive area and there was about $2,000 in damages that were awarded. If you reverse on the law of the case, it knocks out all of the nearshore composition evidence of Dr. Nairn. And as a result, the damage is evidence of Dr. Moore on his hedonic damages as to the value of the land lost. It's unroboted and we can enter judgment on that figure. Would that call for a remand to establish damages? No, I think it would call for a remand to enter the judgment because there's no contravailing evidence. The damages that the court found, which were very minimal, those were based on a particular liability finding, right? And so if a different liability finding is entered, then the court should have the opportunity to reassess damages based on that difference in liability. I would agree. So the court found that there was no damages on all the other properties because it said that there was sufficient mitigation. And that the plaintiffs hadn't proven their damages. And the plaintiff had not, except for two properties where the plaintiff was entitled to shore protection, but there had really been no value of lost sand or impairment. On remand, though, what is the state of the record on remand? All of the damages evidence comes in through Nairn. And his testimony is then out because it's beyond, because it's based upon a false proposition that there was only 50 cubic yards of sand and that it was entirely mitigated. So what is left is unroboted damages evidence of Dr. Moore, of the loss of the fair market value and the value of the sand. Wait a minute, wait a minute. One of the things you argue is for future additional damages, for future shore protection, for about $119 million. And your argument seems to be that you only need to establish it, that it would have been sound economy to have made the expenditures to protect the property. But where did you show that it would be sound economy for the homeowners to spend $119 million on those properties? Well, that would be an issue of the homeowners, whether they value the property to protect it. Yeah, but where is it in the record? I mean, that's a, if you're going to argue that, I think you have to argue that to a trial court and let it be tested. Well, that would be on the future damages. And I would agree with you on the future damages. There were three different figures depending on the headland beaches, and that's unsettled. I would agree with you on that. But each homeowner came in and testified that, in fact, they wanted to put in shore protection and they valued their property and they wanted to keep it. So there would be the sound economy. I have two and a half minutes left. Right. Do you want to reach out at that time? I would. Okay. Thank you. Mr. Schmeltzer. Good morning, Your Honor. May it please the Court, John Schmeltzer for the United States. Your Honor, there's two sets of issues that we've touched on here. Why doesn't the law of the case apply here? It doesn't apply here, Your Honor, because the issue that was decided in Banks 2 and Banks 4 is not the issue that is before the Court now with respect to liability and damages. The question in Banks 2. But to establish liability, wouldn't the appellants have to establish that the damages were permanent and irreversible? They'd have to show a permanent physical taking. That's correct. Right. So why is that different then from the accrual showing where they also had to show a permanent physical taking? Because they didn't need to show a permanent. This Court didn't need to find that the reports, the 1996 through 1999 technical reports that were cited in Banks 2 and 4 as providing constructive knowledge of a cause of action were actually accurate as to the plaintiff's properties or were accurate generally. That finding was made. Your Honor, the finding was not made by the Court of Federal Claims. The Court of Federal Claims in Banks 1 found that the cause of action accrued in 1989, which was the end of the project. This Court on remand said that in order to decide the issue of notice and accrual, we have to first find out, decide whether there's been a physical taking and if it's permanent. And they addressed that issue and that was part of the remand order that went back down. Right. I would quarrel a little bit with how the Court framed the issue that was in Banks 2 and in Banks 4. Sure. And as I said, in Banks 2, what the Court was addressing was the finding by the Court of Federal Claims that the claim accrued in 1989. And what the Court found was that was clear error because in 1989 there was a mitigation program ongoing and so the Court couldn't sort that out. The Court didn't need to, and of course there was no trial at that point, and there were no findings on trail and composition or erosion at any of the properties. And at that time the Court didn't need to determine that the technical reports were actually correct as to the plaintiff's properties. I want to know... Wait, wait, stop. Sure. Sorry. Okay. I want to know when you say the Court erred in framing the issue. Right. That was in Banks 4. Right. Okay. Did you appeal that? No, no, no. I didn't say the Court erred in framing the issue in Banks 4. What I was trying to get at was Judge Rayne's description of the holding in Banks 4. What Banks 4 held was it was clear error for the Court of Federal Claims to find that the cause of action accrued in 1952. Remember, the Court of Federal Claims went backwards, right? You were on that panel. And so what you found and what the panel found was that it was clear error to reach backwards. And the Court found that there was no new evidence sufficient for the Court to reopen the finding, and the Court determined that there was nothing before the 1996 through 1999 technical reports that provided the constructive knowledge. But again, the key date for the Statute of Limitations, Your Honors, is 1993. Can I see if I understand your position? I think your position is that for the purposes of accrual, the question was simply whether those letters put the plaintiffs for the first time on notice that the taking might have been permanent and irreversible. And so that was why it accrued at that point. On the other hand, for purposes of liability, you're saying the government is free to present evidence showing that those letters were incorrect. Even if they did provide notice, you could, for purposes of liability, present Dr. Nairn's testimony to suggest that what was said in those reports wasn't exactly right and it is reversible. That's absolutely right, Your Honor, although I would add that the fact that the 1996 through 1999 technical reports gave constructive knowledge was not disputed, as the plaintiffs' counsel suggests, because obviously that was within the Statute of Limitations' time period. The only facts that were disputed vis-a-vis the Statute of Limitations were the facts prior to 1993, which is the key date for the Statute of Limitations. The key questions for the Statute of Limitations were the facts that occurred from 1836, when the harbor was first developed, through 1903, through 1989, or actually through 1993, was there facts in that time period that provided a cause of action and knowledge of the cause of action. Mr. Schmeltzer, do you have the record with you? I have the appendix. Maybe you can help me out. I'm old and everything's gone, including my eyes. The key table cited in Niren's sediment budget to support the 30% determination is at 7732 in the appendix. Your question, Your Honor? Yeah, can you read me those numbers? I just cannot for the life of me figure those out. The same budget, Your Honor, is also presented in the appendix at pages 8279 and 8280. And unfortunately, the numbers are too small. Small? They're not small. I can't see them. I can't see them either, Your Honor. I apologize for the small reproduction. But the 30% figure was law of the case before this was prepared. The 30% figure comes from an admission in the 1973 report based on a finding at that time that there was 110,000 cubic yards blocked by the jetties in the littoral drift. And we go through the brief. We explain how the 30% finding came from that admission. The court found that we had admitted that and made a finding that that's law of the case. Dr. Niren, when he presented his sediment budget, explained to the court that he had revised the figure based on the blockage of littoral drift, that it's now 50,000, and he'd re-gone through all the numbers, and he had determined that the actual percentage but for mitigation would be 25%, not the 30%. And you're saying all these numbers are elsewhere in the record? Well, they're summarized in this table, but they're presented in the course of two multiple-day trials. And, of course, the Court of Federal Claims... This is a summary of his findings, yes. I'm sorry? Yeah. Yes. So he did? Yes, absolutely. He relied on these tables. He prepared these tables. The data in the tables was challenged at trial by some of the plaintiff's experts, but the Court of Federal Claims... I guess my question is, how do we know that since it is completely and totally illegible? Well, Your Honor, it wasn't necessarily presented in this size at the Court of Federal Claims. The Court of Federal Claims is the finder of fact. I don't care what the Court of Federal Claims had in front of it. I care about what I have in front of me. I appreciate that, Your Honor. And all I'm trying to say is that if you look to the very legible decision by the Court of Federal Claims in Banks 3, the Court of Federal Claims steps through every one of these issues in excruciating detail. If you tell me that the tabulation is elsewhere, I'll look at it. But don't tell me I can gather the numbers and put them in when even the column headings are illegible. Your Honor asked me a question about a 30%. The direct answer to that was it's not in this table at all. I know, but you also told me Niren relied on... This is a summary of his work and he relied on it. If the Court wishes, we could provide a blow-up of this table and provide it to the Court. But the important thing for the Court to remember is there's a lot of columns here. There's a ton of information here on the blockage of sand by the jetties, the dredging, the sediment provided by the river, the change to the shoreline by other man-made structures. Let me change the subject a little bit, speaking of changes. Banks alleges on page 53 of the blue brief, and frankly, I found this looking at Burgoyne surprising. I mean, as a lawyer, I used to cross-examine an awful lot of appraisers. That his appraisal method for reduction in value of the properties is flawed because it only used the front footage of the property rather than accounting for the decreased depth of the property. And in effect, I'm going to draw in the air, but in effect it said if there's a peninsula sticking out into the water and people picnic on that and so on, and then it's all eroded and instead you have a bay running right up to the house and you no longer have that land, it's okay because the front footage is the same. Is that correct? Because that's the way I read it. That's not entirely correct. What Mr. Burgoyne determined as part of his appraisal was that if the loss from erosion in lot depth, the landward movement of the shoreline, if it took away a particular feature that had value that would be represented in the market, then that was considered. The basic understanding, though, of the appraisal was that the primary indicator of market value for shoreline properties is the width of the lot, your view, your ability to access the lake, and that simply losing a few feet of erosion doesn't necessarily affect the market value. But I would like to come back to a much more fundamental point, is the United States did not need to put in any damage evidence whatsoever. The burden was on the plaintiffs. The valuation evidence that the plaintiffs put in is not even a valid method for determining what is a taking. Did the claims court, did it determine that that methodology was flawed and not reliable and therefore it wasn't going to consider it under a Daubert kind of analysis or was it more of a credibility determination? Are you talking about the damages now? Yes. The Court of Federal Claims dismissed Moore's testimony with respect to damages on a couple of grounds. The Court did find Mr. Burgoyne's testimony to be more credible, but then also found flaws within the methodology that was used by Dr. Moore, and the principal one that the Court pointed to was the fact that Moore's analysis doesn't account for actual physical loss, physical loss from the property, the amount of erosion on the property. Your Honor, you must remember that there is evidence in the record about the movement of the ordinary high watermark with respect to all of these properties from the period of 1950 through the point when they were appraised. As the findings demonstrate, almost half of the properties actually grew larger than they were in 1950. Property size grew larger? There wasn't erosion in terms of the ordinary high watermark. The ordinary high watermark did not move landward with respect to 18 of the 40 properties that were looked at. There was a wide difference in terms of the actual property loss. What the plaintiffs did in putting on Dr. Moore is they did an event study of an event that was a supposed announcement, the 1999 technical report that came out in January of 2000. What they were trying to determine based on that event analysis was what did this announcement, what impact did that have on the temporary market value of the lots? They found that all of the properties actually appreciated in value from before and after, but they found that the appreciation in the plaintiff's zone was less than in another place. Therefore, they're entitled to millions of dollars as a result of this, but they valued the wrong event. They didn't value a taking. They valued just the impact of an announcement. An announcement isn't a taking. It has no relationship to the physical loss of the property. If the government had come in, for example, in January 2000 and had taken a backhoe across the backs of all the plaintiff's properties and they had a uniform amount of property taken and then they used it. That would be a fine analysis. Can I interrupt you for a minute? Your point is that it's the event that's the problem, the 1999 report. Had there been some other event that was identifiable, you would be okay with the type of framework? It can't be any other event. It has to be the physical taking. So you said if the government came with a backhoe. And the other problem is, Your Honor. Can I ask you a different question? I want to ask you. I know that the court credited the government's expert, and the government's expert did have some amount of damages, at least for some of the plaintiffs, I think for five of the properties. That's right. But then the Court of Federal Claims awarded zero in damages. That's based on the liability finding, Your Honor. Why is that appropriate? It's based on the liability finding. It was an alternative finding of damages if there had been. But I thought the liability finding was that there was a taking, the government with the jetties had caused 30% of the erosion. 30% from the time period from 1950 through 1970. And from the period from 1970 through the point of appraisal, based on the sand budget and the expert testimony that was presented, the Court of Federal Claims found that once the Corps of Engineers changed its practices and didn't take the dredged material from the Inner Harbor to Deep Lake, but actually put it on the shoreline, south of the property, so it was there to nourish the properties, that there was no effect on a sand deficit from the jetties. Once they changed the practice and they placed the mitigation. What happens if we reverse on the court in its determination as to whether on the law of the case, the issue? What does that do to the damages finding? Your Honor, I would think that the court should still, and what we argue in our briefs, that the court should still affirm because the plaintiffs did not present a viable method for evaluating. I'm going to follow up. I think Judge Wallach also has a follow-up question. You're out of time. Let me ask you this question. I guess this is a yes or no question. I know it's somewhat unfair. Do you agree that the banks for remand order of this court had a clear finding as to a permanent taking and that the court failed to mitigate? No. Okay. May I follow up, Your Honor? Sure. Quickly. It's just because that was based entirely on statements from the technical reports. The technical reports didn't have to be true at that point to show that the claim wasn't time barred because what mattered for the time bar was whether there was constructive knowledge prior to 1993. There's a ton of evidence in the record, Your Honors, about shoreline composition, about wave energy, about each of the plaintiff's properties losses. None of that was before the court. Hold on. So when the case was remanded, did the Court of Federal Claims undertake a whole new liability inquiry, or did it just adopt one of its alternative findings? Your Honors, at that point there had been two separate liability terms. It was divided into liability and damages phases, but at the damages trial the court allowed the – Excuse me. I was asking did it undertake a whole – No. It did not. It did not because there had been – It reached back and it took one of its alternative findings, correct? Which was based on years of litigation and two separate files. They were also based on the 1999 report, correct? The liability findings were not based on – Those alternative findings I'm talking about. Right. They were not based on – The 96 through 99 technical reports were part of the evidence before the court. Okay. That's what I'm asking. But the court didn't find that there was no liability from 1970 through 2000 because of the reports. What the court found is the reports didn't apply to the coastline. Okay. I have some other questions. I have one other question. It may devolve into more. In the 2007 liability opinion, it appears that the court challenged the 30% erosion liability admission from the 73 report. And the Court of Federal Claims actually found that 50,000-cubic-yard number you proposed was more accurate than the 100,000-cubic-yards underlying the 30% valuation. But the Court of Federal Claims still assessed liability at 30% at the end of that opinion. That's correct. And that's the number that you're citing and it's carried through to this opinion. That's correct. Is it your understanding that the factual determination of 50,000-cubic-yards doesn't affect the liability determination? No. It's not your understanding. So what is your understanding? The liability determination is based on the sand budget that was presented by Dr. Nairn. As you sort out all the numbers from the chart that I apologize, Your Honor, it's difficulty reading. But it's the information that's presented on that chart. You can't argue that chart. You can't. I mean, unless you open that page and you read me what these numbers say going across, and I defy you to do it on some of these columns, you can't. You can't argue that chart. The government has, or the parties, in this case it's a government exhibit, have placed into the record of this court something that is gibberish. Your Honor, the plaintiffs have never argued, nor did their experts argue, that they couldn't read the numbers on the chart. They challenged the numbers on the chart for a variety of reasons that the Court of Federal Claims specifically rejected in a very comprehensive and exhausting analysis. No, you don't understand me. You're arguing too late. I'm going to just make this record. I want you to open to that page. Yes, Your Honor. It's 7732. Thank you, Your Honor. There appears to be a column. I'm guessing is nine because it appears to be next to something that's column Roman numeral eight. You see that? It's one, two, three, four, five, six, seven, eight columns over. Some of them are subdivided below. Do you see that one? It seems to say zone 2A something. Yes. What are those numbers? You tell me. Those numbers are not readable on the version of 7732. Nor in the next column. The numbers are reproduced at appendix 8279. Counsel, wait. It's the same chart and they are readable on that chart. Counsel, sir. Yes, sir. Why don't you just submit a new copy of this particular page, okay? One that's legible. Yes. I know we may have to. Your time is over. Let's hear now from Mr. Christensen. You had some information for us, Mr. Crenshaw? I do. At appendix 1811 and appendix 89 and appendix 103, we identified the Nairn motion in limine. In addition to the 2007 opinion and the page numbers I gave for the court applied an incorrect methodology to admit that evidence. At appendix 3532 to 3533, we identified 10 cents a cubic yard for sand. At appendix 2486 to 89, we have Scudder Mackey's testimony on the 70% erosion. Thank you. The issue is that the 50,000 cubic yards that is relied upon by the underlying court to say there is no liability is a number that's made up out of thin air. It's inconsistent with the 99 report, which had 110 cubic yards for the gross littoral drift. That comes out of DX1, which was Plaintiff's Armina Defendant's Experts Report, part of the report that we moved to BAR under Daubert. The court's ruling, it's difficult to argue to the court what its own mandate meant, but we think permanent meant permanent. We don't think there's two different permanents, and we think irreversible means irreversible. The evidence in that report is consistent with the Coastal Engineering Manual, which identifies what a cohesive shore is. With respect to establishing Dr. Moore's testimony, his methodology was not criticized. What Dr. Moore did was he took the appraisal value of the homes that was provided by Burgoyne, because that's really what Burgoyne did. He didn't do a before and after analysis. He just gave an appraisal value in 2000. He included in that then an erosion zone and out of erosion zone evaluation of the increase in value of homes over a period of time, and he plotted it. That's how he came up with his 42% difference, of which he had 90% confidence. Moore's testimony is combined with Dr. Meadows' testimony. Dr. Meadows' testimony was that he went property by property by property by identifying how much land had been lost above the Ordinary High Watermark, with the bluff falling in, and came out with about 1,800,000 cubic yards when you did the sum total. There's a correlation between the actual land loss and the diminution in value that's provided by Dr. Moore. The credibility of these witnesses is beyond dispute. The foundation for that damage as testimony is there. As to the claim by the government that somehow the Ordinary High Watermark was pinned further away such that from an aerial view you had a larger land mass, notwithstanding the fact that you had lost volume of sand into the ocean, Dr. Nairn admitted that he pinned the Ordinary High Watermark there because people had put shore protection out. The waves were hitting the shore protection and not coming all the way up into the property where the Ordinary High Watermark normally would have been. And he admitted to that under cross-examination. He also admitted that there had been a volume of loss of sand. I was going to start off my question. Well, you're almost out of time, or actually you're over your time. I'm sorry. Could you conclude? I'll let you give a very brief couple-sentence conclusion. I can, and I can hearken back to the Robert Frost poem of 1916. There are two roads in the Yellowwood. The first road for reversal is that the finding of the court was inconsistent with the mandate. The second road in the woods is that there was no way Dr. Nairn should have come through the door under Daubert. This is not a weight of credibility. His testimony was made up, inconsistent, not peer-reviewed, and should be thrown out. Once that happens, we now have a liability of finding, and this case gets remanded for the entry of judgment on damage. That's not the way I read the poem, but it's okay. All right. Thank you very much. We thank all counsel for their arguments. Thank you.